Stephen **BLOCK**, et al., **Plaintiffs**,

v.

**DISTRICT OF COLUMBIA**, et al., **Defendants**.

Civ. A. No. 90–0658 (CRR).

United States District Court, District of Columbia.

Oct. 16, 1990.

Michael J. Eig, Matthew B. Bogin, and Margaret A. Kohn of Bogin & Eig, Washington, D.C., for plaintiffs.

Richard D. Albright, Asst. Corp. Counsel, with Herbert O. Reid, Sr., Corp. Counsel, D.C., Martin L. Grossman, Deputy Corp. Counsel, D.C., and Melvin W. Bolden, Jr., Chief, Sp. Litigation Section, for defendant District of Columbia.

Cecilia E. Wirtz, Legal Counsel, District of Columbia Public Schools, and Pollie H. McElroy, Associate Legal Counsel, District of Columbia Public Schools, for defendant Andrew Jenkins, III.

## OPINION OF CHARLES R. RICHEY UNITED STATES DISTRICT JUDGE

CHARLES R. RICHEY, District Judge.

Unfortunately, this case is yet another skirmish in the seemingly never-ending war (at least in this jurisdiction) pitting the public school system against handicapped children and their parents on the battlefield of the Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1400 *et seq.* Stephen Block (a thirteen-year-old learning disabled student) and his mother are suing to force the District of Columbia ("DC") and the District of Columbia Public Schools ("DCPS"), in the name of its Superintendent Andrew Jenkins, III, to abide by the Hearing Officer's administrative ruling that DCPS must maintain and fund Stephen's placement at a private school (the Chelsea School) for the 1989–90 school year. In a separate lawsuit, which has

since been consolidated with this action, DCPS appealed the Hearing Officer's adverse determination.

Thus, putting to one side its somewhat complicated procedural history, this case is actually an appeal from the Hearing Officer's ruling in the Blocks' favor.[1] Having carefully considered the entire record before the Hearing Officer, the parties' arguments,[2] and the underlying law, the Court holds that, because DCPS has not shouldered its burden of proving that the Hearing Officer was wrong, it must reimburse the Blocks for the tuition and related services necessary to maintain Stephen's placement at the Chelsea School ("Chelsea") for the 1989–90 school year.

## I. Procedural History and Statutory/Regulatory Framework

None of the parties dispute that Stephen's learning disabilities and "multiple secondary deficits" render him a handicapped child within the meaning of the EHA. *See* 20 U.S.C. § 1401(a)(1). The primary purpose of the EHA is to "assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." § 1400(c); *see Spiegler v.*

District of Columbia, 866 F.2d 461, 463 (D.C.Cir.1989). To that end, the EHA provides that state and local agencies may receive federal funds to assist them in educating handicapped children but only if the agencies comply with specific goals and procedural requirements. *See* §§ 1412–1415; *see also Board of Educ. v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). Moreover, the EHA contemplates that the free appropriate public education "will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as nonhandicapped children, but the [EHA] also provides for placement in private schools at public expense where this is not possible." *Burlington School Comm. v. Department of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985) (citing § 1412(5); 34 C.F.R. §§ 300.132, 300.227, 300.307(b), 300.347 (1984)).

During the 1988–89 school year, pursuant to the EHA, DCPS placed and funded Stephen at the Center School, a private special education facility in Chevy Chase, Maryland. In June 1989 the Center School closed down and notified both the Blocks and DCPS. DCPS responded by preparing a new Individualized Education Plan ("IEP") in July 1989 for the school year beginning in September 1989. *See Spie-*

1. The Hearing Officer entered his final administrative decision on December 28, 1989 and denied DCPS's motion for reconsideration on February 21, 1990. On January 29, 1990, DCPS appealed the Hearing Officer's ruling by filing a Complaint with this Court in *Jenkins v. Block, et al.*, Civil Action No. 90–0203. However, by March 22, 1990 DCPS had not yet served the Blocks and had done nothing to prosecute its case while also not complying with the Hearing Officer's ruling. Therefore, on March 22, in an apparent effort to short-circuit DCPS's delaying tactics and ensure timely compliance with the Hearing Officer's ruling, the Blocks filed their lawsuit for declaratory and preliminary injunctive relief. At a status call held for both cases on April 26, 1990—by which point DCPS still had not effected service—the parties agreed that the lawsuits were in effect two sides of the same coin and that the Court could resolve this entire dispute without considering any evidence other than the administrative record before the Hearing Officer. Consequently, with the parties' consent, the Court consolidated the two cases (subsuming all claims raised by DCPS in its

appeal into the above-captioned later-filed case) and also consolidated the evaluation of the Blocks' preliminary injunction motion with this evaluation of the merits. *See* April 27, 1990 Order at 2 (citing Fed.R.Civ.P. 65(a)(2)).

Also, although both DC and DCPS are parties to this lawsuit, DCPS has been the primary litigant. Therefore, throughout this Opinion the Court will refer to DCPS and will discuss DC separately only when necessary.

2. In accordance with the Court's Order, instead of filing motions, the parties each filed Proposed Findings of Fact and Conclusions of Law. Subsequently, the Blocks sought to rebut DCPS's proposed findings and conclusions by filing a motion for leave to file a reply thereto, which DCPS opposed. Since DCPS would not be prejudiced—it has responded in its opposition to the arguments raised in the Blocks' proposed reply—the Court will, in the exercise of its discretion, grant the Blocks' motion for leave to file a reply to DCPS's proposed findings of fact and conclusions of law.

*gler*, 866 F.2d at 466 ("educational agencies must review and, where appropriate, revise each child's IEP at least annually" (citing § 1414(a)(5))). The IEP—the *"modus operandi"* of the EHA—is "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." *Burlington*, 471 U.S. at 368, 105 S.Ct. at 2002 (citing § 1401(19)).[3] On August 8, 1989, DCPS proposed placing Stephen at the Buchanan Secondary School ("Buchanan"), a DC public school for learning disabled students.

Objecting to the IEP as inappropriate and incomplete and to the proposed placement at Buchanan, the Blocks exercised their rights under the EHA and on August 16, 1989 requested a due process hearing before an impartial hearing officer. *See* § 1415(b)(2). The applicable regulations required the formal due process hearing and a decision thereon to be completed by October 2, 1989,[4] but the hearing was not held and a decision (oral) not made until October 13, 1989, *see* Administrative Record ("AR") Tab XII, with a written decision filed on October 27, 1989, *see id.* Tab XIII. Although the Blocks immediately accepted one of the September dates proposed by the Student Hearing Office, *see id.* Tab VII, the absence of any response in the record by DCPS to the dates that the Blocks and the Student Hearing Office suggested indicates that the significant delay until October 13, 1989, when the due process hearing finally was held, was attributable to DCPS.

At that hearing the Blocks put on evidence to show that DCPS had not completed the necessary evaluations of Stephen and to support their contention that DCPS's new IEP for Stephen, when compared to the previous year's IEP, was incomplete and lacking in several significant related services (such as occupational therapy, speech language therapy, socio-emotional counseling, and adaptive physical education). Therefore, the Hearing Officer ruled that DCPS had not carried its burden of proving that the new IEP and the placement at Buchanan were appropriate. *See* AR Tabs XII, XIII. However, over the Blocks' objection, the Hearing Officer gave DCPS additional time to evaluate Stephen and complete his IEP. *See id.*

In November 1989, after DCPS had evaluated Stephen and added the related services listed above, DCPS again proposed Buchanan for the 1989–90 school year. The Blocks again objected, and on November 20, 1989 another due process hearing was held, which was a full-blown adversarial hearing on the merits with direct and cross-examination of several witnesses. *See* AR Tab XXXV. The Hearing Officer issued his final determination on December 28, 1989, ordering DCPS to maintain and fund Stephen's placement at Chelsea for the 1989–90 school year. However, instead of complying with the Hearing Officer's unequivocal ruling, DCPS brought—and half-heartedly maintained, *see supra* note 1—its appeal in this Court.

## II. Analysis

Since this is an appeal from the Hearing Officer's ruling, the Court first must resolve the threshold issue of what standard of review to apply. Although the standard of review is not as clearly defined as it could be, it is well established that in this kind of case courts do not start with a

---

**3.** In most instances, the IEP "is to be developed jointly by a school official qualified in special education, the child's teacher, the parents or guardian, and where appropriate, the child." *Burlington*, 471 U.S. at 368, 105 S.Ct. at 2002; *see also McKenzie v. Smith*, 771 F.2d 1527, 1529 n. 2 (D.C.Cir.1985). Moreover, "[i]n several places, the [EHA] emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness." *Burlington*, 471 U.S. at 368, 105 S.Ct. at 2002 (citing §§ 1400(c), 1401(19), 1412(7),

1415(b)(1)(A), (C), (D), (E), and 1415(b)(2); 34 C.F.R. § 300.345 (1984)).

**4.** The hearing officer's decision must be made within 45 days after receipt of the student's request for a hearing. *Spiegler*, 866 F.2d at 466 (citing 34 C.F.R. § 300.512(a)). In this case, the Blocks' hearing request was received on August 22, 1989, establishing October 2, 1989 as the decision deadline—at least according to the Student Hearing Office's calculations. *See* Administrative Record Tab VI.

clean slate. *See Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051 ("the provision that a reviewing court base its decision on the 'preponderance of the evidence' [§ 1415(e)(2) ] is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"). However, while *de novo* review is inappropriate, a court's authority is not so limited that it must accord the hearing officer deference as great as the "clearly erroneous," "abuse of discretion," or "substantial evidence" standards of review. *See Spiegler*, 866 F.2d at 464–65.

In short, the standard of review is somewhere in the middle with courts giving "due weight" to administrative proceedings, *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051, and applying a "preponderance of the evidence" test, § 1415(e)(2). The United States Court of Appeals for this Circuit has elaborated somewhat on this intermediate standard of review:

> Deference to the hearing officer makes sense in a proceeding under the [EHA] for the same reasons that it makes sense in the review of any other agency action—agency expertise, the decision of the political branches (here state and federal) to vest the decision initially in the agency, and the costs imposed on all parties of having still another person re-decide the matter from scratch. But the district court's authority under § 1415(e) to supplement the record with new evidence,[5] as well as Congress's call for a decision based on the "preponderance of the evidence," plainly suggest less deference than is conventional.

> We will not try here to capture the appropriate deference in some formula.... *[W]e think it clear that a party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong ...*

*Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C.Cir.1988) (emphasis added); *see also Leonard v. McKenzie*, 869 F.2d 1558, 1561

(D.C.Cir.1989) (quoting *Kerkam*). Thus, in this case the Court may reverse the Hearing Officer's decision only if the Court— giving his decision due weight—is nevertheless satisfied that DCPS has shown by a preponderance of the evidence that he was wrong. *Andersen v. District of Columbia*, 877 F.2d 1018, 1019 (D.C.Cir.1989); *see also McKenzie v. Smith*, 771 F.2d 1527, 1531 (D.C.Cir.1985).

On the record before the Court, especially in view of the special circumstances of Stephen's condition and DCPS's failure to timely produce a complete and appropriate IEP, the Court holds that DCPS has not demonstrated that the Hearing Officer's decision was erroneous. The touchstone of his analysis properly was whether DCPS's proposed placement at Buchanan was "appropriate," § 1412(1), and he correctly recognized that, while a school may be appropriate for a student if he begins the school year there, it is not necessarily appropriate to inject the student into that school part-way through the school year. Apparently DCPS does not learn its lesson well because another member of this Court recognized that same principle in rejecting DCPS's argument for a mid-year Chelsea–to–Buchanan switch in a closely analogous case:

> I therefore find that the Buchanan School, under the circumstances of this case, would not be the appropriate school to send this student to at this time in his career. *It would be the most inappropriate thing to do.* The appropriate place for this youngster is to permit him to finish the remaining seven months of his high school education in the environment that he has been accustomed to over the past three years. *I conclude as a matter of law that it would be inappropriate to transfer this youngster at this time and that the Buchanan School is not an appropriate place for him at this time.*

*Holmes v. District of Columbia*, 680 F.Supp. 40, 41–42 (D.D.C.1988) (emphasis in

---

5. The EHA requires that a district court reviewing a hearing officer's final determination "shall hear additional evidence at the request of a party." § 1415(e)(2). Since both parties rested upon the administrative record, this provision does not apply in this case.

original); *see also Burger v. Murray County School Dist.*, 612 F.Supp. 434, 437 (N.D.Ga.1984) ("Obvious advantages inhere to any child who is permitted to learn in a stable environment. This advantage may have even more meaning to a handicapped child."). In short, towards the end of 1989, when the second due process hearing was held and the Hearing Officer was considering his ruling, he could not, consistent with common sense, blindly evaluate the appropriateness of Buchanan as if it were still the beginning of the 1989–90 school year.

■ Therefore, it is not surprising that the Hearing Officer conducted the second due process hearing in a manner so as to ensure that most of the witnesses addressed the possible impact of a mid-year school switch on Stephen's education. In evaluating the witnesses' responses and weighing their testimony in this regard, the Hearing Officer was utilizing his knowledge and experience such that judicial deference to his expertise is especially appropriate. *See Rowley*, 458 U.S. at 208, 102 S.Ct. at 3052 ("We previously have cautioned that courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.' " (quoting *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973))).

■ In any event, even assuming *arguendo* that such deference were improper, there is more than enough evidence on this record to support the Hearing Officer's decision and withstand the most searching level of judicial review. For example, a DCPS case manager, Dr. Eve Byford–Peterson first agreed that Stephen "is a bright youngster who can be turned off and whose development can be stunted if he is not placed in an appropriate environment," AR Tab XXXV, at 52, and later

stated that removing him from Chelsea in mid-year and placing him in Buchanan "probably would be, could be a problem," *id.* at 64, and would not fill any "educational need," *id.* at 67. Similarly, a DCPS psychologist, Brenda Kinsler, testified that Stephen had adjusted well at Chelsea, *id.* at 83, that removing Stephen from his peer group at Chelsea and putting him into yet another peer group in Buchanan "would affect him but I don't think to the point where he would fall apart ... into nothing," *id.* at 89, and that the parties could "probably not" work together to effectuate a positive transition for Stephen, *id.* at 92. Finally, Dr. Sheila Iseman, the Chelsea Principal, testified that Stephen had made some progress into becoming better integrated at Chelsea, *id.* at 139–40, and that it would be "absolutely" inappropriate to move Stephen to Buchanan in view of the "high level of anxiety and the multiple problems that he displays," *id.* at 140. Thus, it was perfectly understandable for the Hearing Officer to conclude that switching Stephen to Buchanan, after he had already undergone several school moves over the last few years, would be too risky.

Not only does DCPS fail to point to evidence on the record sufficient to overcome the foregoing recitation, but the foundation of DCPS's attack on the Hearing Officer's decision rests on two reeds that are too slender to support the weight of the argument. First, DCPS imitates a horse with blinders by reading one sentence in the Hearing Officer's decision—"Buchanan School is an appropriate placement for Stephen Block," AR Tab XXXVI, at 10—to the exclusion of the rest of the Hearing Officer's ruling and contending that that finding necessarily required a decision in DCPS's favor.[6] Under any reading other

---

**6.** The Hearing Officer's only mistake—if it can be called that—was writing his final determination in a way that provided even the smallest opportunity for DCPS to misconstrue his decision and cling desperately to one piece of driftwood, namely the sentence about Buchanan being an appropriate placement for Stephen. However, in rejecting DCPS's cries for help (in the form of a motion for reconsideration), the

Hearing Officer made his decision clear in no uncertain terms:

> Of course, DCPS is not obligated to pay for a private placement when a public placement is available. The public placement herein is appropriate but not available because it is feared that to transfer the student in the middle of the school year without adequate preparation and where cooperation may not be forthcom-

than DCPS's tortured misinterpretation, it is clear that the Hearing Officer determined that, while Buchanan may have been an appropriate placement for Stephen at the beginning of the school year, it would be inappropriate to place him there if that meant a risky mid-year change of schools from Chelsea—also found to be an "appropriate" placement—to Buchanan. *See id.* at 10–11. In other words, the Hearing Officer held that Buchanan is "appropriate" to the extent that it can "implement the student's IEP" but that, *as of the time of his decision,* Buchanan was not available as a viable option because "Stephen's problems in interacting with peers coupled with high anxiety portends havoc for any program to which he might be changed" and because "[t]he risk to Stephen is too great to hazard a mid-year change." *Id.*

 DCPS's second slender reed is that Stephen's mother's "unilateral" decision to place him at Chelsea bars the Blocks from obtaining reimbursement for the 1989–90 school year. However, DCPS inexplicably refuses to recognize that its failure to provide a complete and appropriate IEP for Stephen in time for the beginning of the 1989–90 school year,[7] coupled with the Center School's closing, forced Stephen's moth-

er's hand. Even DCPS cannot seriously argue that Stephen's mother simply should have kept Stephen out of school and waited patiently until the first day of school had come and gone in the hope that DCPS somehow would save the day or that the Blocks should have foregone their statutory right to challenge DCPS' incomplete and inappropriate IEP. DCPS lost the right to make this "unilateral decision" argument when it failed to comply with the EHA's procedural requirements, about which the Supreme Court has stated: "[W]e think that the importance Congress attached to [the EHA's] procedural safeguards cannot be gainsaid." *Rowley,* 458 U.S. at 205, 102 S.Ct. at 3050.

 Moreover, DCPS's failure to comply with the EHA's procedural requirements were not *de minimis* oversights with no effect on the 1989–90 school year. *Compare Leonard,* 869 F.2d at 1561–62 (rejecting plaintiffs' procedural attacks because errors either involved earlier or later years and therefore were irrelevant to the school year at issue or in one instance constituted a minor "administrative foul-up" that did not affect plaintiffs in any appreciable way). In this case, assuming without deciding that "prejudice" is a prerequisite,[8]

ing is too great a risk. DCPS may be more than willing to accept that risk but it is not DCPS' anxiety that will be put to the test. *Should Stephen be moved midyear into another program and suffer regression and heightened anxiety, DCPS' comfort in the placement will be at the expense of his torment.* The student's educational progress should not be risked because of DCPS' aversion to private school funding. This would be obvious to DCPS if they thought in terms of students rather than public versus private.

... Given such testimony [elicited at the due process hearing], the only way to be sure just how bad Stephen would be affected [by a mid-year switch to Buchanan] would be to move him into the program. *This is the macabre experiment that DCPS suggests. Stephen is a live human being whose intelligence and abilities are misaligned but who still thinks and feels. He must be accepted as the student he is and not as a pawn because DCPS does not want to spend money on placements at private schools.*

AR Tab XXXXIV (emphasis added).

7. At the first due process hearing (October 1989), the Hearing Officer found that DCPS's

IEP was incomplete and not appropriate and therefore rejected the Buchanan placement proposal. DCPS seemed to concede that the IEP was incomplete, and because it did not appeal that decision, the Court accepts the Hearing Officer's October 1989 ruling as correct.

8. Whether handicapped children and their parents need to prove prejudice and, if so, how much before they may obtain relief under the EHA has not been conclusively resolved in this Circuit. *See Andersen,* 877 F.2d at 1021 ("we do not reach the issue of when a procedural failing might invalidate a placement"); *Leonard,* 869 F.2d at 1562 n. 3 ("we do not address whether *legal errors* (in the form of violations of [EHA's] procedural requirements) are to be subject to a separate test of 'prejudice' " (emphasis in original)). However, the *Andersen* court analyzed several Fourth Circuit cases and *Leonard* in terms of whether certain procedural errors prejudiced the handicapped children and their parents and how seriously they were harmed. *See Andersen,* 877 F.2d at 1021–22 (citing *Spielberg v. Henrico County Pub. Schools,* 853 F.2d 256, 259 (4th Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 192 (1989); *Board of Educ. v. Dienelt,* 843 F.2d 813, 814–15 (4th Cir.

the Court holds that the Blocks have shown that they were seriously prejudiced and that DCPS's failure to provide a complete and appropriate IEP and its delay in rectifying the problems directly affected the 1989–90 school year. *See Spiegler,* 866 F.2d at 467 (examining EHA's legislative history and noting special emphasis that Congress placed on prompt resolution of disputes to minimize interruptions in children's special education programs).

In short, having failed on several fronts to comply with the EHA's procedural requirements and having repeatedly delayed resolution of this dispute, DCPS may not now cry over the milk it spilled. Under these circumstances, the decision to enroll Stephen in Chelsea was entirely proper, and it in no way deprives the Blocks of their right to reimbursement for all of the expenses for tuition and related services necessary to maintain Stephen's placement at Chelsea for the 1989–90 school year.

■ Nor should there be any dispute that the statutory provision which states that the court "shall grant such relief as the court determines is appropriate," § 1415(e)(2), authorizes this Court, once it affirms the Hearing Officer's decision, to direct DCPS to reimburse the Blocks for the 1989–90 school year expenses at Chelsea. Whatever uncertainty may have surrounded this question has been dispelled since the Supreme Court decided *Burlington School Comm. v. Department of Educ.,* 471 U.S. 359, 105 S.Ct. 1996, 85

L.Ed.2d 385 (1985). One of the questions on which the Court in that case granted certiorari is directly relevant here: "whether this grant of authority [under § 1415(e)(2)] includes the power to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the [EHA]." *Id.* at 369, 105 S.Ct. at 2002. Answering this question, the Court held that "we are confident that by empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case," *id.* at 370, 105 S.Ct. at 2003 and concluded, "We do not agree ... that a parental violation of § 1415(e)(3) constitutes a waiver of reimbursement," *id.* at 372, 105 S.Ct. at 2004.[9]

The Court recognizes that, to meet its responsibilities under the EHA, DCPS is not required to provide an educational program "to maximize the potential of handicapped children," *Leonard,* 869 F.2d at 1561 (quoting *Rowley,* 458 U.S. at 189, 102 S.Ct. at 3042; *Kerkam,* 862 F.2d at 886), and that "proof that loving parents can craft a better program than a state does not, alone, entitle them to prevail under the [EHA]," *id.* (quoting *Kerkam,* 862 F.2d at 886). At the same time, however, the Court notes that, to satisfy its duty to give a handicapped child a free appropriate public education, DCPS must provide " 'a basic floor of opportunity' ... 'individually de-

---

1988) (per curiam); *Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 635 (4th Cir.1985)). Therefore, this Court will follow *Andersen's* lead and assume *arguendo* that some sort of prejudice test should be applied.

9. DCPS relies on the EHA's so-called "stay-put" provision, *see* § 1415(e)(3) (during pendency of any proceedings under this section a handicapped child shall remain in "then current educational placement of such child"), and case law holding that a parents' unilateral decision to move their handicapped child into a private school while EHA proceedings are pending bars them from recovering tuition reimbursements. *See Rowe v. Henry County School Bd.,* 718 F.2d 115 (4th Cir.1983); *Mountain View–Los Altos Union High School Dist. v. Sharron B.H.,* 709 F.2d 28 (9th Cir.1983); *Stemple v. Board of*

*Educ.,* 623 F.2d 893 (4th Cir.1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). As an initial matter, DCPS's citation to these cases is frivolous and may well be a violation of Fed.R.Civ.P. 11 and the Code of Professional Responsibility, DR 7–102(A), because, as the textual discussion demonstrates, the Supreme Court's subsequent *Burlington* decision has rendered those cases obsolete. *See Burlington,* 471 U.S. at 370, 372, 105 S.Ct. at 2002, 2003; *see also McKenzie v. Smith,* 771 F.2d 1527, 1535 (D.C.Cir.1985) (quoting *Burlington* ). In any event, DCPS's stay-put provision argument is inapposite because Stephen's "then current educational placement" (the Center School) was no longer available and because DCPS neglected its duty to "locate and arrange a placement in a similar program." *Id.* at 1533; *see also Knight v. District of Columbia,* 877 F.2d 1025, 1029 (D.C.Cir.1989).

signed to provide educational benefit to the handicapped child.' " *Id.* (quoting *Rowley*, 458 U.S. at 200, 201, 102 S.Ct. at 3047, 3048). In this case, DCPS did not do so. As the Hearing Officer correctly determined, DCPS did not provide an appropriate placement for Stephen until the middle of the 1989–90 school year, by which point moving him from Chelsea to Buchanan would have been inappropriate as posing too great a risk to Stephen's educational progress.

### III. Conclusion

Based upon its independent review of the administrative record and giving due weight to the Hearing Officer's decision, the Court holds that DCPS has failed to meet its burden of proving by a preponderance of the evidence that the Hearing Officer was wrong. Because DCPS's failure to provide an appropriate and complete IEP forced Stephen's mother to enroll Stephen at Chelsea and because that was an appropriate placement for the entire 1989–90 school and Buchanan was not, the Blocks are entitled to reimbursement for their expenses for Stephen's tuition at Chelsea and all necessary related services (including transportation) for the 1989–90 school year. Therefore, the Court will enter judgment against DCPS and DC, jointly and severally, and will direct them to reimburse the Blocks after the proper authorities have conferred with the Blocks for the purpose of determining the total amount of reimbursement due in accordance with the Court's ruling.[10]

The Court will issue of even date herewith an Order in accordance with the foregoing Opinion.

---

**10.** DC has contended throughout this lawsuit that it is not responsible for the education of handicapped children and that DCPS, as the "state educational agency," is the proper party. That may be correct if this case were still at the administrative level or involved non-monetary relief. However, here the situation is different because the relief sought—while not called "damages," *Burlington*, 471 U.S. at 370–71, 105 S.Ct. at 2002–03—nevertheless requires disbursement of public funds. Faced with the dilemma of DC's denial of responsibility and a district court case concluding that DCPS is not a "suable entity," *Tschanneral v. District of Co-*

### ORDER

In accordance with the Court's Opinion of even date herewith, it is, by the Court, this 15th day of October, 1990,

ORDERED that the Blocks' Motion for Leave to File Reply to Defendants' Proposed Findings of Fact and Conclusions of Law shall be, and hereby is, GRANTED; and it is

FURTHER ORDERED that the Hearing Officer's administrative ruling in the Blocks' favor shall be, and hereby is, AFFIRMED; and it is

FURTHER ORDERED that judgment shall be, and hereby is, entered in favor of the Blocks and against the District of Columbia ("DC") and the District of Columbia Public Schools ("DCPS"), jointly and severally, in the amount of the Blocks' expenses in tuition for the Chelsea School and related services (including transportation) for the 1989–90 school year; and it is

FURTHER ORDERED that, within twenty (20) days of the date of this Order, the appropriate officials from DC and/or DCPS shall confer with the Blocks to determine their total expenses and calculate the precise amount of the judgment awarded in the immediately preceding ordered paragraph; and it is

FURTHER ORDERED that, within forty-five (45) days of the date of this Order, DC and/or DCPS shall reimburse the Blocks for their 1989–90 school year expenses by paying them the judgment awarded herein, calculated as described in the immediately preceding ordered paragraph; and it is

*lumbia*, 594 F.Supp. 407, 409 (D.D.C.1984), the Blocks have proceeded against both DC and DCPS. Having held that the Blocks are entitled to reimbursement and noting that most, if not all, of the cases cited in this Opinion include both DC and DCPS as parties, the Court will not resolve whether DC or its "subsidiary" DCPS is responsible for paying the judgment. They will be held jointly and severally liable for the full amount of the Blocks' 1989–90 school year expenses, allowing these two governmental entities to decide amongst themselves how best to discharge their liability.

FURTHER ORDERED that this case stands DISMISSED from the Court's docket, except that the Court shall retain jurisdiction over any issues that may arise involving the calculation and payment of the judgment ordered herein and the recovery of attorneys' fees, if any.